Filed 4/7/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JENNIFER K.,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>SHANE K.,<br><br>  Defendant and Respondent. | A155111<br><br>(San Francisco County<br>Super. Ct. No. FDV-17-813669) |

Appellant Jennifer K. and respondent Shane K. are the parents of a daughter they have jointly parented since her birth in 2009.  On December 22, 2017, 10 years after a "dating" relationship had ended, appellant filed a request for a domestic violence restraining order (DVRO) from the San Francisco County Superior Court.  The request stated that respondent "has been verbally abusive and physically violent with me since I met him in July or August of 2007.  In fact, though I love her dearly and feel grateful every day to be her parent, our daughter is the product of a rape that [respondent] perpetrated on me in 2009, a week after I had stopped dating him.  It began while I was asleep and continued after I resisted.  Since this happened so long ago, I will spare the court the details; I raised this to shed light on my fear of [respondent] and why it is reasonable, my having endured his abuse for many years, abuse which continues."

The request for a DVRO went on to describe the alleged rape and certain other violent acts assertedly demonstrating respondent's abusive treatment of appellant since the birth of their daughter.  These matters were

1

the subject of a bench trial lasting six afternoons, at which the court heard the testimony of the parties and 18 other witnesses, 8 on behalf of appellant and 10 on behalf of respondent.

On May 23, 2018, after the receipt of testimony and closing arguments of counsel, the court denied appellant's request for a DVRO, dissolved all provisions of the temporary restraining order that had been granted pending the hearing on the DVRO, and explained from the bench the bases of its determinations at considerable length.

Appellant asks this court to reverse denial of the restraining order, issue a protective order, reverse the custody order, and remand that matter "for reconsideration based on the presumption against granting custody to a perpetrator of domestic violence." Appellant also requests that we remand this case to a different judge. We shall deny the requests and affirm the judgment.

The appeal presents two issues: whether the trial court erred in finding that one of respondent's alleged prior acts did not constitute "abuse" within the meaning of the Domestic Violence Prevention Act (DVPA) (§ 6200 et seq.) and whether, as appellant also claims, "[g]ender bias disqualified the judicial officer as a matter of due process."

## THE FACTS

Appellant's opening brief focuses on the three incidents of alleged domestic violence by respondent that the trial court found did not constitute "abuse" within the meaning of the DVPA: (1) the alleged rape on January 1, 2009; (2) punching a refrigerator door near appellant's head in 2011; and (3) slamming appellant into a door frame on November 10, 2017. However, the only allegedly abusive act as to which appellant challenges the trial court's ruling is the punching of the refrigerator door.

2

*The Alleged New Year's Eve Rape*

Appellant testified that in December 2008, shortly after she and respondent ended their dating relationship, he contritely begged her to give him another chance and she agreed to accompany him to a New Year's Eve party. Respondent insisted on driving her home and she agreed because she was tired and "had a little too much to drink." When they arrived at her house, respondent said he was too tired to drive home and wanted to sleep at her house. She initially said "no," but after he "begged and wheedled and pleaded" she agreed and told him he could sleep on the couch. She then went to bed in her room on the other side of the house. Appellant "half woke up" when she felt respondent touching her waist and "pulling on" her. She slid away from him to the edge of the bed and he "reached for me, he put his hands on either side of my waist, he rolled on top of me and he—I wouldn't call it sex. He had intercourse with me." Appellant said "stop" and "pushed him away with my hands." She tried to slide out from under him, but he "was holding my hands down at my side" and "held me down." She did not scream because no one would hear her and she thought that might make respondent more angry. Respondent did not use a condom despite the fact that he knew she had "a hereditary disease, a blood clotting disease that prevents me from using any form of birth control" and he therefore had to always use a condom. After respondent ejaculated, appellant "screamed, 'What did you do?' And he said, 'Shut the fuck up, go to bed.' " Appellant then ran to the bathroom, took a shower, and (despite the fact that taking birth control pills could kill her) found a package and took "a bunch of them." Appellant then went online to see how many birth control pills one must take to equal a "morning after pill," "went back to the bathroom and took some

3

more of them.  And I just curled up on the couch with a blanket and cried."
Appellant acknowledged that she never reported the rape to authorities.

Noting that her pleadings asserted that she wanted respondent "out of her life" after he raped her, defense counsel asked appellant about an e-mail she sent him three days after the rape, forwarding a Craigslist posting of an item for sale and joking whether that was what he wanted for Christmas. Appellant did not recall sending that e-mail, but she did recall going out to drink beer with respondent on January 18, 2009, as shown by a Facebook posting on that date, inviting respondent and his dog to take a walk with her on January 24, and commenting favorably on his Facebook postings throughout 2009.  Appellant also acknowledged that six months after she was allegedly raped by respondent, she allowed him to move into her building without paying rent, and later to move into her own apartment; she invited him to her annual family gatherings in Alabama in 2009, 2010, 2011, and perhaps 2012, and agreed to have sexual contact with respondent during those gatherings; and went camping with appellant and his family for four years after the alleged rape.

Respondent contradicted appellant's entire account of what happened on New Year's Eve.  According to him, he and appellant did not stay out late nor drink very much that night and when he took her home, she invited him inside where they continued to talk, started kissing, ended up "making out," went into her bedroom, undressed, engaged in foreplay and had sex.  "At no point did she give any indication that she was not a perfectly willing participant in everything that we were doing."  Appellant was not drunk and he "absolutely" did not "force himself on her in any way."  Respondent stated that "[w]hen we first started dating, she was very slow to warm up to having a physical relationship and so I was very used to her indication that she was

4

not interested in physical contact. And I've always been very respectful of her boundaries. And that night I was particularly sensitive because we were in sort of a broken up state and I just didn't want to be doing anything inappropriate." After they had sex, respondent testified, "[w]e cuddled in her bed and went to sleep like we had many times before when we were dating."

Respondent said that the next morning, "we both lamented the fact that we had again engaged—had sex without using protection. It had happened before and both times we felt sort of dumb about it afterwards, and then we amicably parted ways and I went home." There was no discussion of the morning after pill or any attempts to address the danger of unprotected sex.

After describing numerous friendly social interactions with appellant following the alleged rape in 2009, respondent testified that the first time he heard appellant "describe our daughter's conception as nonconsensual sex" and claim that she had been raped by him in 2009, was in October of 2017, during their first meeting with a mediator.

### The Punching of the Refrigerator

Appellant testified that during a 2011 argument in her kitchen about what she could feed their daughter, respondent "lunged" at her, she ran to the back door to escape, but respondent blocked her pathway. Respondent "raised his fist and he pulled it back, and he had that same look that I described on his face. You know, this was the first time after so many threats that he—I just knew that was coming from my head, I saw it coming. And I just didn't want her—all I could see was my daughter's face." At that point, appellant testified, respondent "kind of turned and hit the fridge." Then, "shocked at his own behavior," respondent "sort of withdrew." Respondent's

punch left a dent in the refrigerator door that was 54 inches above the floor which, appellant said, "was just about the level of my face."

The "look" appellant had previously described—"his eyes kind of bulge, his face gets red, he juts his head forward, his arms go back, he puffs his chest out, and he gets this darting around look in his eyes like an animal that's hunting something"—occurred "when he thinks I have gone too far and he is going to get me." Appellant testified that respondent had "made fists" at her dozens of times since 2008, which she found particularly threatening because respondent had told her he had killed a man named Keith Benjamin in a boxing match by hitting him in the head. Appellant's declaration in support of her request for a restraining order included as an exhibit, a news article referring to the death of Keith Benjamin, which stated in passing that boxing was one of his athletic interests but did not say Benjamin died in a boxing match or refer to respondent in any way.

Respondent's descriptions of the refrigerator incident and his boxing history differed dramatically from appellant's, though he did allow that her charge of him punching the refrigerator "is one of the very few things in her testimony that is true."

Respondent explained that he did most of the cooking when he and appellant lived together and always made breakfast. On the morning in question, appellant decided she wanted to prepare breakfast, which "seemed fair enough" to respondent, but appellant planned to feed their daughter old muesli infested with "moth grubs." "And so unlike almost any other disagreement we had, that was something I was just not willing to immediately concede," which enraged appellant. Respondent said he was accustomed to appellant's "escalation of anger any time I don't immediately agree to anything," but "in this case it escalated further than it ever had

6

before and she actually physically attacked me. She hit me on the chest with both her fists, which was extremely shocking and I took a step back from her, I punched the refrigerator in one of the lowest moments of my life and walked out of the apartment." Respondent declared that he did not swing at appellant but "intentionally stepped away from her." Nor, respondent testified, did he chase appellant around the kitchen as she described, which was a "complete fabrication."

When asked whether he ever told appellant he had killed Keith Benjamin with a blow to the head while boxing, respondent indicated that too was a fabrication, stating "I never would have said anything like that" and appellant's testimony was "yet another lie about me to try to make me look like a monster." Respondent explained that he boxed because it helped with his "lower back issues." In the beginning, he had ambitions of becoming a competitive boxer, but he found "I have very little natural talent and all the instructors at the gym have pretty much given up on me as a potential fighter."

### Subsequent Events

Appellant described incidents in 2014 in which respondent, who had moved out of her home more than two years before, "terrified" her by entering the house without her consent. Also in 2014, respondent told her that he had a "renewed interest in guns and he was going to target practice and he was getting better and better at his aim," comments that "terrified" appellant, who knew respondent had a gun he previously had said he never used.

Respondent testified that the single time he entered appellant's home without her prior knowledge was in early 2012, shortly after he moved out, when he was getting his belongings from the garage and let himself into the

7

apartment because he needed to use the bathroom. He denied the incidents appellant described.

As for guns, respondent said he had an interest in hunting but was not a gun or hunting "enthusiast" and was in fact "super anti NRA" with "no interest in handguns or assault rifles or anything like that." To demonstrate appellant was not "terrorized" by his occasional use of guns, respondent produced an e-mail she sent him in November 2016, when they were planning a camping trip to celebrate respondent's 49th birthday, stating that friends of hers would welcome them camping on their land and he was free to hunt feral pigs on the property. During the middle of the camping trip, appellant organized a one-day hunting trip to a secluded area and willingly accompanied respondent, who brought his gun.[1]

***The Slamming of Appellant's Body into a Door Frame***

Appellant testified that respondent had agreed to bring their daughter to her house at 9:00 a.m. on November 10, 2017, but did not, so she went to his house to get the child. When she rang the doorbell, respondent opened the door about halfway and she saw their daughter standing behind him. Respondent told her their daughter could not go with her unless she let him have her the next day, which appellant said was her designated day. The daughter started walking toward the door looking worried so, though respondent slammed the door on her, and "was standing in the door blocking

---

[1] Referring to statements by appellant that she perceived respondent's gun use as a threat to her life and "only got peace" when he gave up the gun, and her statement to her therapist that she was so frightened by respondent's use of guns that she was actually afraid to pursue a restraining order, respondent's counsel pointed out that after respondent posted a photograph of himself on Facebook holding a gun over a dead animal, appellant posted three jocular comments. Appellant testified that she found the photograph "terrifying" but acknowledged the "joking" comments she made in response to it.

the doorway with his body most of the way," appellant stepped into the house and reached for the girl. At that point, respondent "slammed" her body "into the door frame." "He had a look on his face like that look I know when he thinks I have gone too far and he is going to get me. . . . [H]is eyes kind of bulge, his face gets red, he juts his head forward, his arms go back, he puffs his chest out, and he gets this darting around look in his eyes like an animal that's hunting something." When respondent then opened the door a little bit, appellant reached towards the girl who moved toward her and respondent again slammed the door. Appellant then put her left hand and foot against the door with her body still against the doorframe and respondent slammed the door against her a third time, directing her to "get out of my house."

Respondent's testimony regarding the November 10 confrontation differed significantly from appellants. According to him, there was no agreement he would bring their daughter to appellant's house that morning. He had asked appellant to come to his house on November 10 to pick up the child because he had told her earlier he was having a 50th birthday party the following day and would like their daughter to be able to attend it. At that time, appellant had herself "actually suggested that our daughter spend the night at [his] house that night," an idea respondent "enthusiastically embraced." However, a few weeks later, appellant inexplicably changed her mind, even though respondent had invited many of their daughter's friends to the party. Respondent asked appellant to pick up their daughter at his house on November 10 because he wanted to try to persuade her to allow the daughter to attend the birthday party the next day even though it was one designated for appellant to have custody. But when appellant arrived at his

9

house and brought up the subject she "got quite agitated and pretty quickly started yelling obscenities at me," and respondent dropped the subject.

Respondent also denied ever slamming appellant into the front door, and claimed that her description of what physically transpired when she arrived at the front door of his house could not have occurred. As he explained, the screen door to his house, which opens outward, was 27 inches from the front door, which opens inward. If appellant was standing a foot or two away from the screen door, as she said, it would mean she was three or four feet away from the front door, and could not simply "step into the house" and reach for her daughter.

Respondent stated that he attempted to close the front door during the interaction because when appellant "gets very angry and starts screaming and yelling at me in front of our daughter I always do whatever I can to shield our daughter from that. Closing the door was a very simple way to end this interaction. So I could turn to my daughter, give her a kiss goodbye, let her gather her belongings, give [appellant] a chance to calm down a bit on the front porch, and then send my daughter on her way." Respondent also emphasized that he did not "slam the door" on appellant nor even "close it forcefully." Respondent explained that just before the door closed all the way it stopped closing and "bounced back into his hand." He initially thought it had "got tangled in a runner carpet that sometimes gets tangled up in the door" but then realized appellant "had leapt forward and was throwing herself against the door and trying to push the door open." At that point, he testified, "I planted my foot behind the door and I said through a crack in the door, get out of my house, get out of my house, over and over again." Respondent tried to keep the door from opening further but "didn't try to

close it until she got out of the way." In other words, respondent claimed, he did not slam appellant into the door, as she erroneously told others.

Respondent stated that if he had managed to close the door completely, he "would have done exactly what I was planning on." Letting appellant "calm down, kiss my daughter goodbye, let her gather her belongings, and send her on the way."

Asked why he did not "nail down some kind of written agreement" with appellant to "formalize a parenting plan" that would prevent misunderstandings about custody exchanges, as other witnesses testified they advised him to do, respondent stated that he pushed very hard for that but every time he did so appellant's "threats escalated." The most common threat "was that she's going to move to the east coast with our daughter," a threat appellant made even before their daughter was born. Respondent took these threats seriously because in 2011, he consulted a family lawyer who told him that if appellant "left the state for work purposes or to be closer to her family or some reason besides just wanting to exclude me from our daughter's life that the court wouldn't support me in fighting that." Respondent did not learn he had been misinformed by the lawyer until 2017, after he got married, when he and appellant were meeting with a counselor "to work out a dispute." When appellant brought up the threat of moving to the East Coast the counselor told appellant "you can't just take your child away." Respondent's "whole career is based on his reputation that he's been building up in the Bay Area for the last 20 years. The court's not going to let you take his daughter away." It was only then, when he belatedly realized appellant's statement that she could take their child and move away was an empty threat, that respondent "started really pushing that we attend mediation and work out a comprehensive co-parenting plan."

11

*Appellant's Witnesses*

Lindsey Huebner, a friend of appellant's for 18 years, testified that during a conversation while appellant was pregnant, appellant "share[d] that her pregnancy was not planned and that her attempt to use the morning after pill had failed." Huebner "sensed there was more to the story" because appellant "seemed serious and guarded when talking about the circumstances of the pregnancy." In 2017, appellant told Huebner she had allowed respondent to sleep on the couch at her house because he was too tired to drive home and " 'woke up a couple of hours later to find him having unprotected sex with her.' " Appellant also told Huebner that respondent "came close to punching her once but hit the refrigerator door instead." Huebner had never personally seen respondent "commit any harm against" appellant.

June Carrin, appellant's therapist, refused to testify and was not subpoenaed, but stated in a declaration admitted into evidence that, in one of her sessions, appellant told her that after taking her home from a New Year's Eve party in December 2008, respondent forced her to have non-consensual sex with him without a condom."[2]

N.C., appellant's cousin, testified that the parties were a "poorly matched couple." Although appellant was "really vibrant and decisive," in respondent's presence she "always seemed worried, and she always had to check with [respondent] before she could make simple decisions," such as whether she could wake their child up from a nap. He was "particularly

---

[2] Because Carrin, a named witness, did not appear and submit to cross-examination, respondent initially moved to strike her declaration, but later withdrew the motion, telling the court, "we'll either subpoena her or will proceed without having her testify." Respondent then stipulated to entry of the declaration into evidence and it was received by the court.

controlling" about what appellant could give the child to eat.  However, N.C. never saw respondent physically abuse appellant in any way and could only vaguely recollect him once "yelling at her" at an unspecified time in the past.

Ronald Turner, who had been friends with appellant for almost 20 years and dated her for "a couple of years" around 2012 and 2013, agreed to keep their relationship quiet in the beginning because of appellant's "deep fear" of respondent.  He knew she feared respondent because "we talked about it a lot, and there would be times when I'd pick her up and she was always nervous if she had just seen" respondent.  Turner never witnessed respondent physically abuse appellant or threaten such harm, but in 2012, while waiting for her outside her apartment, "I could hear yelling and slamming doors."  In 2014, after they stopped dating, appellant told him respondent had been using her keys and asked Turner to help her change her locks.

Kelley, the nanny for the parties' daughter for many years who remains "significantly involved in their family," testified only about the timing of her delivering and picking up the parties' daughter from school.  On cross-examination she testified that if she had witnessed conduct or behavior on the part of respondent that she felt unsafe for the child she would report it to appellant or to a child protective agency, but never had reason to complain of respondent's conduct.  Kelley never saw respondent yell at appellant or commit a violent act toward her, or ever heard him threaten appellant physically.

Christina Mueller, appellant's friend for about 12 years, was told by appellant that her co-parenting relationship with respondent had been getting more contentious and "she mentioned a specific incident where there was shouting, and it's just been more extreme."  Mueller could tell from her

"body language" that appellant "appeared increasingly upset with each month that passed between book club meetings." In 2017, appellant told Mueller that respondent had slammed her into a door and showed her bruises. Mueller never heard respondent yell at appellant or saw him physically abuse her.

Dawn Payne, a friend of appellant's for about seven years, testified that she took a road trip with appellant and respondent in 2014, and noticed that respondent seemed "visibly tense" and was not interacting with others. She got the impression he was "irritable" because generally respondent "is just a very personable, funny, kind, laid back guy, and he wasn't acting the way he normally did." Later, during a phone conversation, respondent told Payne that appellant "had filed court papers against him that were, quote, 'all lies.' " She found these revelations "unsettling" because she did not know him or appellant "well enough for him to be a confidant and tell me bad things about someone sort of out of the blue." Payne acknowledged on cross-examination that she had never witnessed any disputes between respondent and appellant nor seen him harass or threaten appellant "or abuse her in any way."

J.P. worked at the preschool the parties' daughter attended and dated appellant for a period while the daughter was at the school. He had a fraught relationship with respondent during that period, because respondent was offended that he and appellant kept their relationship hidden from him despite making it known to everyone else at the school. Respondent only learned of their relationship from others on a school trip that J.P. attended; respondent told J.P. "he didn't feel comfortable with me being there," though J.P. did not think appellant was jealous or wanted to renew his relationship with appellant. J.P. also testified that after appellant interacted with respondent, she "was often visibly shaken and afraid," and "sometimes" after

custody exchanges she would appear "upset or vacant or preoccupied." On cross-examination, J.P. testified that he and respondent calmly discussed their relationship and he "feels safe" around him, and acknowledged that he had never seen respondent physically abuse or threaten appellant.

Carolyn Rooney, who had known appellant for over 18 years, testified that on two past occasions appellant told her respondent "would burst out and start yelling at her about things that she had no control over, including projects that he was working on or income that he was expecting to receive." Asked whether she was aware of anything else indicating appellant was afraid of respondent, Rooney stated that when appellant started dating Turner in 2011, appellant felt she had to hide the relationship "because she was afraid" of respondent's reaction, and of the "rage" respondent "regularly unleashed on her." But Rooney had never personally seen him yell at her, and appellant never told her respondent physically harmed her in any way.

### Respondent's Witnesses

Respondent's first witness, Jessica Post, had "extensive" contact with both parties and weekly dinners with them 40 or 50 times, never once saw respondent even raise his voice to appellant, and never heard appellant express any fear of him. Asked whether she had ever seen respondent get his way in a dispute with appellant regarding their daughter, Post stated that appellant "always got her way" because respondent "just avoided conflict." Appellant, "was definitely the one that had more power and more say." While appellant often complained to Post about respondent's conduct regarding financial issues and his "forgetfulness," she "never" complained about "violence, abuse, or being in control." Asked what happened to the parties' relationship when respondent married and he and his wife had a child, Post stated that "everything changed." Appellant felt excluded from respondent's

15

home, "felt it was dumb to have another kid due to his tax debt," and criticized his failure to plan for their daughter's college fund. Post also testified that, before respondent married, appellant suggested that Post date him, never warning that respondent was abusive or had raped her.

Whitney Wright was in daily contact with the parties, individually and together, between 2010 and 2014, because their children all then attended the same preschool. Appellant never complained about respondent harassing her or being abusive, nor did she even indicate any fear of him. According to Wright, respondent was "sweet," "super trustworthy," and "a solid guy who absolutely loves his daughter."

Carlyn S., respondent's mother, attended the parties' 2016 camping trip when appellant went hunting. Contradicting appellant's testimony, she testified appellant knew in advance that respondent planned to bring a gun on the trip, and saw it in the back of the van in which they all drove to the campsite. Appellant never expressed fear due to the presence of the gun and respondent's intended use of it.

J.F., the head of the preschool the parties' daughter attended, frequently interacted with the parties during the four years their daughter was a student. Until the fourth year, the parties were "exemplary co-parents" and friendly with one another. But this was not true during the final year, when their relationship changed dramatically. Once appellant began working at the school part time, she began talking about respondent "persistently and repeatedly." Aware of their increasing custody disputes, J.F. advised the parties to get a formal custody agreement and told them how to obtain free assistance. Respondent was enthusiastic about this idea but appellant was not. J.F. testified that whenever appellant complained about respondent she always advised her to "get a parenting plan, get something

16

written down," but appellant was invariably unwilling to do this. Shortly before she left the school, appellant told J.F. she was "really glad" she didn't take my advice "because now she had complete control over [their daughter] and if she wanted to move or do something else, she could" and without an agreement she could limit respondent's rights.

While appellant was teaching at the school, and in the presence of other teachers, she often complained that "I wish he was out of the way. I just wish he wasn't even involved." Her complaints "seemed really minor and her reaction to him was way over the top. Complaints like, he let her watch a video, he didn't put her to bed on time, he wouldn't let her have a dessert, things like that that seemed like really minor parenting complaints given her level of angst." During their daughter's last year at the school, however, respondent "just gave way, gave way, gave way." Respondent told J.F. that he let appellant get her way because if he did not she "could take it out on [their daughter] and he didn't want that to happen."

J.F. stated that appellant never showed any fear of respondent, and she never saw any indication he was "abusive or controlling" of appellant, and "that was not in his nature or character." Asked whether "you have any fear of" appellant, J.F. said she did, explaining that when appellant worked at the school other employees reported that "she was writing things down to report for licensing" and after she left the school, J.F. received "state licensing things that we were all pretty sure came from her, that they were inside things about files and things that an average observer wouldn't know." All of the licensing inquiries were "unsubstantiated," but J.F. remained "afraid of her bad mouthing the school" and was therefore "reluctant" to testify for respondent.

17

Calhoun and Johnson both taught at the preschool with appellant. Calhoun testified that during the end of that period appellant was angry at respondent for wanting more time with the parties' daughter although respondent, who was more "flexible" and normally "catered" to appellant's wishes, never sought an unfair amount of custody. Calhoun, who was then more friendly with appellant than with respondent, never perceived that she had any fear of respondent. Nor had Calhoun ever seen any conduct on his part suggesting he was abusive to appellant in any way.

Johnson testified that appellant was often unable to control her emotions. As examples she recounted appellant's statement that she wanted respondent "out of the way" as if she wanted him dead, she was also "a little abusive" in the way she talked about some of the children at the school in conversations with others, and sometimes she "got a little bit loud and impatient with those children." Johnson also stated that appellant "was having a lot of problems with our director at the time and made mention of just kind of documenting everything [at the school] she thought was wrong and also saying that she sought to call licensing [authorities]."

Jenny P., respondent's girlfriend and then wife, was present at five or six of appellant's drop-offs of the parties' daughter at her and respondent's home and characterized appellant's conduct at those times "as consistently aggressive and insulting and controlling. She walked through the house as if she lived there. She went into [the daughter's] room and took clothes out of her drawers to take back to her house, plopped down at our kitchen table, brushed [the child's] hair and sat on the couch as long as she wanted to. There was never a drop-off or never a pickup where she took [the child] and left." Appellant showed no fear of respondent and often related her negative

feelings about him to Jenny P. knowing respondent was within hearing distance.

Jenny P. also witnessed the alleged door slamming event on November 10, 2017. Because appellant was so frequently coming into her house and "and acting in a way that was crossing everyone's boundaries" and respondent and Jenny P. wanted to make their home a "safe space" for respondent's daughter, they agreed he would tell appellant she was not welcome inside their home when she dropped off or picked up her daughter. When respondent communicated this information to appellant she "screamed" at him, in front of their daughter, "What, I'm just being cast aside?" Exclusion of appellant from the interior of respondent and Jenny P.'s house was the rule when appellant arrived at their front door to pick up her daughter on November 10, 2017.

Jenny P., who was 9 or 10 feet from the door that day, heard appellant and respondent speaking to one another heatedly in the presence of their daughter, who was standing behind respondent. When appellant began "screaming" at respondent he tried to close the door to shield the child from her hostility. Appellant did not at any time reach into the home to comfort her daughter. When respondent tried to close the front door, appellant "jumped forward over the step in front of the door and threw her body against the door to get it open and then wedged the right side of her body, her foot and her leg into our house to keep the door open." Respondent "put his foot behind the door to keep it from opening further, but did not try to close the door." At no point, Jenny P. testified, did respondent slam appellant against the door. The dispute resolved when the daughter walked through the partially open door and she and her mother left.

A short while later, Jenny P. received a text from L.K., respondent's sister, who was flying in as a surprise for respondent's 50th birthday party the next day, saying that appellant had offered to pick her up at the airport. Jenny P. texted back that appellant had just left her house and "had a melt down on our porch and please, will you please not have her come back to the house today." L.K. then told Jenny P. that going to respondent's house was the daughter's idea, because she wanted to personally present L.K. to her father as her birthday present to him. To accommodate the child's wishes, and realizing respondent would want his daughter there, Jenny P. agreed to appellant's return. Jenny P. expected the child to spend the night of the party at their house, but appellant came to pick up her daughter at 6:00 p.m. the following evening, before the party began. Respondent was very frustrated but did not object, wanting to spare his daughter "one more scene of conflict."

Jenny P. also described several brief meetings with appellant during custodial exchanges at which appellant pounded on the window of their van and screamed at respondent and/or Jenny P. in the presence of their daughter. Jenny P. believed appellant disparaged respondent to their daughter because the daughter told her that respondent "hasn't known Jenny P. long enough to have a baby with her" and respondent "doesn't have enough money to have a second baby." Jenny P. also testified that when respondent spoke to his daughter on a speaker phone he asked her to go into a room where they could talk privately, but appellant would not allow this. When respondent asked or told his daughter something, "instead of letting them speak to one another" appellant "spoke for her daughter and in this way prevented" respondent from talking to his daughter.

20

L.K. testified that appellant, with whom she was friends, never led her to believe her brother was violent or abusive or indicated any fear of him. She had never seen respondent impose his will on appellant, which would have been unusual because appellant ordinarily imposed her will on him. While appellant was capable of quickly escalating anger, respondent "was very calm and clear." On November 10, 2017, when appellant drove her from the airport to respondent's house, appellant said nothing about being slammed into a door, and expressed no fear for her safety. When appellant refused to allow the daughter to spend the night at respondent's house, he and everyone else were disappointed but acquiesced to appellant's wishes.

Alicia Salvatore dated respondent in 2012, after he moved out of appellant's residence. She testified that their relationship broke up due to the daily demands appellant made on him and his fear she would undermine his relationship with their daughter if he did not satisfy those demands. Salvatore testified that "because they didn't have a custody agreement," respondent "feared some sort of retaliation" from appellant if he was not immediately responsive to her constant requests. During this period, respondent suffered considerable stress and anxiety due to these demands not only interfering in his relationship with Salvatore but obliging him to include appellant when he took their daughter to visit his parents in Washington State.

Lauren K., respondent's stepmother, testified that appellant came to Portland six or seven times to spend time with her and respondent's father and also participated in five or six family camping trips, although respondent never wished her presence at any of these events. "She wanted to be there and he didn't want her to be there but felt powerless. He didn't want her to get angry and not allow her to come. He felt he had to do this and of course I

21

think it was crucial, that he felt he had to do that to keep up his relationship with [his daughter]."

With regard to appellant's allegations that respondent told her he had killed a man while boxing, a declaration was entered into evidence from Paul Wade, the owner of the gym where respondent boxed. Wade stated that he had "direct knowledge of the facts and circumstances surrounding Keith's death" and respondent was "not in the ring with Keith" and had "nothing to do with his death." Wade added that respondent is a "very passive," "non-confrontational" and "gentle person" who got into boxing "simply to stay in shape."

### The Ruling of the Court

The court's ruling on the foregoing issues is as follows:

"It's been a long trial. I've heard a lot of testimony. I've had a lot of chance to see the witnesses and hear the evidence. I've reviewed the testimony again and the transcripts and I've reviewed the exhibits.

"I am denying the restraining order. I'm going to tell you why. I want to tell you on the record so you understand why I'm denying it. I'm going to talk about the specific incidents, [starting with] the door. Based on the eyewitnesses, the configuration of the doorway, I think it was more likely that the father was shutting the door to end the shouting match and that the mother moved into the breach to keep the door from closing.

"I think it's much more likely that she tried to enter the house after being told not to do so. I don't think that the father tried to slam her and [injure] her. That's what I find after listening to the witnesses and the credibility of their stories. And that I think that narrative—that set of events is supported by the father's wife who had a clear view. A deliberate slamming of the door on someone entering your house is a very violent act

22

and the mother's conduct after that event is not consistent with someone who was violently attacked and injured.

"I also find that the mother saw the door closing quickly and jumped forward to use her body to keep it from closing in an effort to get inside to get her daughter. I don't find that the father closing the door to end a shouting match and inadvertently closing it on the mother is an act of domestic violence.

"The refrigerator, I do believe that—I think the father admitted he punched that refrigerator. I do not believe he tried to hit the mother. Based on the evidence that was presented at trial, I think he vented his frustration in a physical way and he regretted it but did not try to injure the mother. That was no evidence . . . that the father communicated anything that was implied that the punch was a threat or an effort to hurt her.

"The rape, that's obviously a very serious allegation. I listened to the evidence. It was seven years ago. I heard the testimony of both the witnesses who were there. They are completely inconsistent with one another. I have to look at the whole picture and other circumstances, the actions of the parties before and after.

"What I see and the evidence based on that that was presented, seven years of conduct that is more consistent with two parents co-parenting in the best interests of the child. I did not see evidence that was consistent with what I would expect following a forcible rape.

"I also have to look at whether on balance that one event from seven years ago followed by conduct that I saw following that event and over the last seven years warrants the issuance of a DVRO. I don't conclude that it does.

"Ultimately, my conclusion is the testimony of the father on the issue of that forced nonconsensual sex was more credible than the mother."

The court acknowledged that there had been occasions when respondent appeared to violate a temporary restraining order. Referring to appellant's testimony that she was frightened when she found respondent outside their daughter's school at times he should not have been there. However, as the court observed, "the evidence strongly suggests that [respondent] was near the school to pick up [the child] for his visitation time and he did not know it would be [appellant] who was dropping her off. He was also making efforts to stay away from the school and waiting until she was dropped off. I find no intentional effort. He actually tried to avoid contact and interaction on those pick-ups. I find no intentional effort by . . . [respondent] to violate the temporary restraining order nor a pattern of violence that would support the issuance of a domestic violence restraining order with respect to violations of the [temporary restraining order (TRO)]."

The court observed, "I gave this a lot of thought. I don't know that any other case has occupied my time and attention more than this one."

Appellant's appeal from these rulings is timely.[3]

---

[3] On December 4, 2019, this court granted the unopposed applications of the Domestic Violence Legal Empowerment and Appeals Project and Family Violence Appellate Project for leave to file amicus curiae briefs in support of appellant.

# DISCUSSION

## I.

### *In Exercising Its Discretion, the Court Did Not Apply an Incorrect Legal Standard, the Standard of Review is Therefore Not De Novo Review but Abuse of Discretion, and the Trial Court Did not Abuse Its Discretion*

Appellant contends the trial court erred as a matter of law when it denied her request for a DVRO on the ground that when respondent punched the refrigerator, he did not intend to hit her. The DVPA "defines domestic violence as 'abuse' perpetrated against" enumerated individuals, including a former spouse or cohabitant. (Pen. Code, § 6211, subds. (a) and (b).) Its purpose is to prevent the recurrence of acts of such abuse and to provide for a separation of those involved in order to resolve the underlying causes. (Pen. Code, § 6220).) To this end, the DVPA provides for the issuance of restraining or "protective" orders, either ex parte or after hearing that enjoin specific acts of abuse. The DVPA defines "abuse" as either an intentional or reckless act that causes or attempts to cause bodily injury; an act of sexual assault; an act that places a person in reasonable apprehension of imminent serious bodily injury to himself or herself or to another; and an act that involves any behavior that has been or may be enjoined under section 6320. The behavior that may be enjoined under section 6320 includes "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing [and making] annoying telephone calls as described in section 653m of the Penal Code." (Pen. Code, § 6320, subd. (a).) A court may also enjoin "disturbing the peace of [another] party, and, in the discretion of the court, on a showing of good cause, of other named family or household members. ([Pen. Code,] § 6320.) A trial court is vested with discretion to issue a protective order under the DVPA simply on the basis of an affidavit

showing past abuse.  Specifically, it 'may' issue an order 'with or without notice,' to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.'  ([Pen. Code,] § 6300.)"  (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 (*Nakamura*).)[4]

Acknowledging that the general standard of review for the denial of a domestic violence restraining order is abuse of discretion (*Nakamura, supra*, 156 Cal.App.4th at p. 337), appellant maintains that is not the case here because the issue in this case is whether in exercising its discretion the trial court applied an incorrect legal standard, which requires de novo review, citing *Gou v. Xiao* (2014) 228 Cal.App.4th 812, 817 and *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 821.[5]

As appellant sees it, the court erred as a matter of law by concluding that respondent "punching the refrigerator close by [appellant's] head was not an act of abuse because he was not trying to injure appellant . . . because

---

[4] *Nakamura* also notes that "[t]he foregoing provisions of the DVPA confer a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally.  For example, the 'abuse' that may be enjoined under Penal Code sections 6203 and 6320 is much broader than that which is defined as civil harassment. (Cf. Code Civ. Proc., § 527.6, subd. (b).)  Moreover, an order after hearing may enjoin civil harassment only on proof by clear and convincing evidence. ([Code Civ. Proc.,] § 527.6, subd. (d),)  This stringent standard of proof does not apply to an order after hearing restraining abuse under the DVPA.  (See [Pen. Code,] § 6340, subd. (a).)"  (*Nakamura, supra*, 156 Cal.App.4th at p. 334.)

[5] Appellant additionally maintains that the denial of her request for a DVRO was the product of "an intolerably high probability of gender bias violating her due process rights," which is also reviewed de novo.  We reject this argument.

the law does not require appellant to prove that [respondent] *intended* to hit her. It was sufficient that his conduct reasonably made her fear imminent injury and/or destroyed her peace of mind." In support of this argument appellant cites *Nakamura, supra*, 156 Cal.App.4th at page 334 and *Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 559 (*Cueto*), both of which are opinions of this Division. Our opinions do not support the proposition for which appellant advances them.

As we said in *Nakamura*, the DVPA defines "abuse" as "either an *intentional or reckless* act that causes or attempts to cause bodily injury"; an act of sexual assault; "[or] an act that places a person *in reasonable apprehension of imminent serious bodily injury to himself or herself* or to another.*" (Nakamura, supra,* 156 Cal.App.4th at p. 334, italics added.) *Cueto*, which is a bit different from *Nakamura* because it involved *renewal* of a previously granted restraining order, states that such an order should not be granted " 'simply because the requesting party has "a subjective fear the party to be restrained will commit abusive acts in the future." [Citation.] "The 'apprehension' those acts will occur must be 'reasonable.' That is, the court must find the probability of future abuse is sufficient that a reasonable woman . . . in the same circumstances would have a 'reasonable apprehension' such abuse will occur unless the court issues a protective order." [Citation.]' " (*Cueto, supra,* 241 Cal.App.4th at p. 559.)

As applied to the facts of this case, the reasoning of *Nakamura* and *Cueto* would require the granting of a DVRO only if appellant was able to show *either* that respondent's punching of the refrigerator door was "an intentional or reckless act that causes or attempts to cause bodily injury" *or* "an act that places a person in reasonable apprehension of imminent serious bodily injury." (*Nakamura, supra,* 156 Cal.App.4th at p. 334.) Appellant's

27

claim that it was unnecessary for her to show that respondent intentionally caused or attempted to cause bodily injury in order to obtain a DVRO is therefore correct; but that is the case only if she was able to alternatively establish that respondent's act was "reckless" or that it placed her "in reasonable apprehension of imminent serious bodily injury." (*Nakamura*, at p. 334.) We conclude the trial court understood and applied the correct legal standard, and substantial evidence supports the court's explicit finding that respondent punched the refrigerator door in "frustration," not recklessly, and its implicit finding that his act did not put appellant in reasonable apprehension of serious bodily harm.

Appellant's contentions that she feared respondent "would hurt her when he punched the refrigerator" and that her fear was reasonable are based entirely on her own testimony and reports to others about respondent's anger and control over her. None of appellant's witnesses saw respondent physically harm appellant or heard him threaten to do so; those who testified about appellant's fear of respondent described her demonstration of subjective fear. Respondent disputed virtually all of appellant's allegations, save for acknowledging he punched the refrigerator—but in circumstances entirely different from those she described. Respondent's witnesses, and some of those who testified on behalf of appellant, attested to a character and demeanor completely inconsistent with the conduct appellant described, and described appellant as the more controlling and dominant party in the relationship.

In short, the central issue in this case is not one of law, as appellant urges us to think, but of fact. Essentially, the issue is the credibility of the parties; and as to that matter we must defer to the trial judge. As the exclusive judge of the credit and weight to be given to the testimony of a

28

witness, the trier of fact may reject the testimony of a witness even if, as is certainly not the case here, it is uncontradicted.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890; *Camp v. Ortega* (1962) 209 Cal.App.2d 275, 283.)  The trial court was therefore not required to believe appellant's testimony was true and accurate in every respect.  " 'In passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact is entitled to consider their interest in the result of the case, their motives, the manner in which they testify, and the contradictions appearing in the evidence.' "  (*Camp*, at p. 283.)  That is precisely what the trial court did in this case.

Moreover, " 'we review the entire record in the light most favorable to the judgment to determine whether there are sufficient facts, contradicted or not contradicted, to support the judgment.' "  (*Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.* (2018) 19 Cal.App.5th 258, 270.)  " 'Where, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him [or her] to prevail on appeal by arguing the evidence compels a judgment in his [or her] favor.  That is because unless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found [that party's] evidence lacks sufficient weight and credibility to carry the burden of proof.  [Citations.]  We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence.' "  (*Ibid.*, quoting *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)  It is settled that, "in a bench trial, the trial court is the 'sole judge' of witness credibility.  (*Davis v. Kahn* (1970) 7 Cal.App.3d 868, 874.)  The trial judge may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so.  [Citation.]  The fact finder's determination of the veracity of a witness is

final. (*People v. Bobeda* (1956) 143 Cal.App.2d 496, 500.) Credibility determinations thus are subject to extremely deferential review. (*La Jolla Casa deManana v. Hopkins* (1950) 98 Cal.App.2d 339, 345–346 ['[A] trial judge has an inherent right to disregard the testimony of any witness . . . . The trial judge is the arbiter of the credibility of the witnesses'].)" (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

As earlier noted, appellant does not challenge the court's rejection of her claims of rape and being slammed into a door, but only contests the rejection of her claim that the punching of the refrigerator door constituted "abuse" within the meaning of the DVPA. As to that claim, the parties' descriptions of the event were irreconcilably different, and the court accepted respondent's version and rejected appellant's: "I do not believe he tried to hit her. Based on the evidence that was presented at trial, I think he vented his frustration in a physical way and he regretted it but did not try to injure her. There was no evidence that [respondent] communicated anything that was implied that the punch was a threat or an effort to hurt her." Although not stated in the language of the statute, the court clearly determined that the punching of the refrigerator door was not "an intentional or reckless act that causes or attempts to cause bodily injury," and did not place appellant "in reasonable apprehension of imminent serious bodily injury." Accepting respondent's version of the facts—that he did not "swing at" appellant but rather stepped away from her and punched the refrigerator—the court's conclusion was supported by the evidence.

Because substantial evidence supports the court's finding that appellant failed to show that she was "abused" within the meaning of the DVPA, the denial of her application for a DVRO cannot be deemed an abuse of discretion. (See *Nakamura, supra,* 156 Cal.App.4th at p. 337.)

30

## II.

### *Appellant's Due Process Right to a Fair Trial Was Not Violated Because a High Probability of Actual Judicial Gender Bias Cannot be Shown*

Appellant claims the challenged order "should be set aside" because appellant "was denied her right to an impartial factfinder" in that the judge "appears to have believed that only forcible rape counts as 'real' rape, and that women who have really been raped will report it contemporaneously. Because sexual stereotypes and rape myths infected his decision making," appellant says, "there is a high probability that his decision was the result of actual bias."

As appellant correctly points out, "while a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' [Citation.]" (*People v. Freeman* (2010) 47 Cal.4th 993, 996 (*Freeman*), citing *Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. 868, 877.) Appellant acknowledges that, because this case does not present an issue of a mere appearance of bias, the holding of the California Supreme Court in *Freeman* "is not directly on point." However, appellant, says, "this is a case of probable actual, subjective bias of a particular judicial officer." This is, so appellant maintains, because the judicial conduct in this case is analogous to that in *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237 (*Catchpole*) and *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495 (*Iverson*), both of which our Supreme Court subsequently described as "involv[ing] a pattern of conduct by the judicial officer that rendered a fair trial impossible," so that "notwithstanding language in those

31

decisions about the appearance of bias, the facts amounted to a showing of actual bias based on comments by the judges about women . . . ." (*Freeman,* at p. 1006, fn. 4.)

In *Catchpole,* which was a former employee's action for sexual harassment, assault and battery, and related causes of action, the judge's remarks throughout the trial expressed the sense that he considered sexual harassment cases a "misuse of the judicial system" and his conception of the circumstances that may constitute sexual harassment were based "on stereotyped thinking about the nature and roles of women and myths and misconceptions about the economic and social realities of women's lives." (*Catchpole, supra*, 36 Cal.App.4th at pp. 249, 262.) For example, after assuming the plaintiff's father might blame her for the assault, the judge asked whether her lawsuit was " 'in any way connected with how your father feels about the situation? You want to prove something to him?' " (*Id.* at p. 250.) The judge also repeatedly implied that the plaintiff invited her assailant's attention or consented to his advances despite the fact that the defendants never made such claims nor seriously disputed that the assault, which was corroborated by a police officer, actually took place (their contention was simply that it was not work related). (*Id.* at p. 259.) We concluded that the foregoing comments and many others reflected a predetermined disposition to rule against the plaintiff based on her gender. (*Id.* at p. 249.)

*Iverson* was a marital dissolution case involving the validity of a premarital agreement and which of the parties initiated the marriage. In ruling against the wife—a 40-year-old woman he referred to as a "girl"—the judge described her as "lovely" and commented that she "did not have much education" and had "nothing going for her except for her physical

32

attractiveness." (*Iverson, supra*, 11 Cal.App.4th at p. 1500.) As the Court of Appeal pointed out, the trial judge's reasoning "appears to have been that 'lovely' women are the ones who ask wealthy men who do not look like 'Adonis' to marry, and therefore [appellant] was not credible when she testified [respondent] asked her to marry him." (*Ibid.*) Also, regarding the fact that the couple had been living together before they married, the judge rhetorically inquired " 'why, in heaven's name, do you buy the cow when you get the milk for free.' " (*Id.* at pp. 1499–1501.) The court concluded that the foregoing and similar statements made it clear that in resolving disputed issues of fact the trial judge "entertained preconceptions about the parties because of their gender" that made it impossible for the wife to receive a fair trial." (*Id.* at p. 1499.)

Appellant's argument that the judicial conduct in this case is comparable to that in *Catchpole* and *Iverson* is much too far a reach. Her claim regarding the attitude of the Honorable Richard Darwin focuses on his pretrial statements that "[p]art of the conduct you would expect of someone who was sexually assaulted is to tell someone" and "the absence of statements like that tend to prove against the existence of that event," and his statements, in explaining his ruling, that "I did not see evidence that was consistent with what I would expect following a forcible rape" and "[u]ltimately, my conclusion is the testimony of the respondent on the issue of that forced nonconsensual sex was more credible than [appellant]." According to appellant, Judge Darwin's "emphasis on the element of force suggests that he felt a lack of physical violence and the parties' subsequent co-parenting relationship made the incident insufficient to constitute domestic violence. Researchers in the field have concluded that 'past romantic and sexual relations between a rapist and his victim makes it

33

harder for people to characterize sexual assault as rape, and therefore influence the minimization of the perceived severity of the rape."[6] Appellant argues that Judge Darwin "apparently concluded that because [appellant] did not make a police report at the time and attempted to stay on friendly terms with [respondent] thereafter, either she must have consented to having sex at the time, or unless there was violence no 'real' rape occurred."[7] That reasoning cannot fairly be imputed to Judge Darwin.

Appellant contends that in referring to the alleged rape as "forcible," Judge Darwin indicated that only rapes committed by means of physical force and violence are "real." The court's reference to "forcible rape" did not, however, imply rape necessarily involves an element of force or violence, it simply referred to the rape appellant said she experienced. As earlier noted, appellant testified that respondent forced her hands down at her side and had intercourse with her after she told him no and unsuccessfully tried to push him away. The judge's terms fit the evidence.

Without doubt, physical force and violence are not necessary for nonconsensual intercourse to constitute rape. The record makes clear,

---

[6] For this proposition, appellant's opening brief cites Ben-David and Schneider, "Rape Perceptions, Gender Roles Attitudes, and Victim-Perpetrator Acquaintance (2005) 58 SEX ROLES 385, 398," assertedly relevant portions of which are attached to the opening brief as an appendix.)

[7] Appellant cites *In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698 (*Fregoso*) for the principle that "subsequent friendly conduct by a victim does not prove the absence of abuse." That was a case in which a finding of abuse under the DVPA based on non-sexual physical violence was affirmed although the victim had consensual sex with her abuser after the issuance of a protective order. The case did not involve any question about behavior to be expected of the victim of a rape: The husband argued that consensual sex showed the victim was not afraid of him while the victim explained that consensual sex was part of the couple's pattern of violence followed by attempted reconciliation. *Fregoso* has little bearing on appellant's claim of gender bias.

however, that the trial court's decision was based on its view of the parties' overall credibility and the timing of the rape allegation, not an absence of sufficient violence or a preconceived idea about how the victim of a forcible rape will behave. The evidence showed that for years appellant was on close terms with respondent, invited him to live in her building, and later her apartment, for a considerable period, periodically had sexual relations with him, and accompanied him on numerous family and camping trips, despite the fact that on at least one of the camping trips she knew he brought a gun, which she now says "terrified" her. Yet as soon as he married, had another child, excluded her from his and his wife's home, learned she could not take their child from him by moving away and became decidedly less deferential to her, appellant for the first time publicly accused him of having raped her. Given all this evidence supporting the trial court's rejection of appellant's claim of rape—which appellant does not directly challenge on this appeal despite this aspect of the court's ruling being the one most obviously implicated by appellant's claim of gender bias—the court's comment that it "did not see evidence that was consistent with what I would expect following a forcible rape" does not establish a " ' "probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' " (*Freeman, supra*, 47 Cal.4th at p. 996.)

Judge Darwin's statements about expecting the victim of a sexual assault to tell someone about it, which appellant sees as reflecting an "unfounded misperception about sexual assault," were made in a pretrial conversation with counsel regarding the number of live witnesses the parties desired to present and purposes for which the court would permit testimony. The court initiated the conversation by observing that "[t]o the extent anyone is offering live witness testimony for the sole purpose of showing that

35

[respondent] is a good or bad or peaceful or violent, or happy or angry person, I am not going to allow that testimony. I think that is inadmissible evidence of character or reputation offered to prove his conduct on a specified occasion, and that fits squarely within Evidence Code section 1101 and is excludable on that ground, unless you can convince me that it's admissible for some other purpose. For example, the purposes set forth in [Evidence Code section] 1101[, subdivision] (b). The same thing would go for evidence about [appellant]. [¶] So there will be no testifying by people about, you know, she told me this or he told me that as a way of trying to prove the truth of those events. That's classic hearsay."

Shortly thereafter, appellant's counsel advised the court that she wanted to present witnesses "to speak to incidents that my client shared with them, not for the purpose of proving yes, these things happened, but because I would think that part of the court's analysis in deciding whether the past act or acts" of abuse actually occurred "there would be some weight I would think given to did she tell anyone. [¶] So I would be offering that proof not to prove it's true, because none of the people who are testifying . . . are here to say they have seen anything or actually witnessed it, but that over the years, over time there are people who are prepared to say she told me this, she told me that, and I would think there would be some weight to that, and I wouldn't be offering it for the truth of the matter." When respondent's counsel argued that such testimony "is essentially submitted for the truth of the matter asserted," the court responded, "if you make an argument that part of the reason why I shouldn't believe [appellant's] story is that she never told anyone of whatever the event is, then I think she is entitled to bring someone to say yes, I did, I told this person, solely for the purpose of

36

demonstrating I did in fact tell someone. It rebuts the argument that you are making."

The court then went on to make the statements appellant now relies upon to show judicial gender bias: That if "the sexual assault that's been alleged by [appellant] in 2009 is supposed to be a basis for . . . the restraining order she is seeking now[,] and I have to figure out as a part of my ruling whether it happened, whether there is a preponderance of evidence of whether it happened, it will be relevant to my analysis as to whether she said anything about it to anyone ever. [¶] I would not use . . . the testimony of what the person says as proof of what the person is relaying to me, but rather it's part of the conduct part . . . of the conduct you would expect of someone who was sexually assaulted . . . to tell someone, whether it's the authorities or someone else. And the absence of statements like that tend to prove against the existence of that event, and the existence of statements, whether they were detailed or not or vague or frequent or infrequent, the existence of those statements could potentially play into that question." So with that guidance" the court stated, "we can proceed."

Neither party objected to the court's statements that one "would expect someone who had been sexually assaulted" "to tell someone, whether it's the authorities or someone else," and that the absence of such a statement would "tend to prove against the existence of that event."

In support of her claim Judge Darwin "was under the influence of a 'rape myth' and would be biased against [appellant] based on her failure to report the rape to authorities," appellant emphasizes the absence of evidence "real" rape victims are inclined to report their rapes to the police or others near the time of the assault. We have no quarrel with the valid contention, amplified by the amicus briefs and long ago recognized by our Supreme Court

37

(*People v. Brown* (1994) 8 Cal.4th 746, 758 [view that it is natural for victim of sexual assault to complain promptly "substantially discredited"]), that traumatized rape victims often do not promptly report that they have been raped, or do so only long after the event, and sometimes never disclose the fact.

Indeed, because this frequent reaction to rape may not be appreciated by the trier of fact, it is well established in California that rape trauma syndrome evidence is admissible to rebut the inference that an alleged rape did not take place due to conduct portrayed as inconsistent with the victim having been raped. As our Supreme Court has unanimously declared, in an appropriate context "expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248; accord, *Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1024–1026 [rape trauma syndrome evidence admissible to explain why victim wrote letter of apology to her alleged rapist as "most lay jurors would think it unusual for a victim of sexual assault to apologize to her alleged attacker"]; *Delia S. v. Torres* (1982) 134 Cal.App.3d 471, 478 ["The reactions of rape victims . . . , while perhaps subjects on which we commonly hold opinions, albeit ones that may be grossly erroneous, are *not* subjects within the common knowledge of jurors; hence, where relevant, expert testimony is appropriate."], disapproved on other grounds by *Christensen v. Superior Court* (1991) 54 Cal. 3d 868, 906, fn. 28; see also, CALCRIM No. 1192.) [8]

---

[8] We are also mindful that some believe the common knowledge of judges regarding the reactions of rape victims may be no more elevated than that of lay jurors, so that the credibility of rape victims may be as unjustly

But the record makes clear that the challenged ruling here did not result from the court's reliance upon a rape myth. While absence of a prompt complaint is not a reliable indicator that an alleged sexual assault did not occur, the circumstances surrounding a delayed complaint may be relevant in evaluating the likelihood that the assault occurred. (*People v. Brown, supra,* 8 Cal.4th at pp. 760–762.) In fact, appellant not only failed to object to the statement she now castigates, she invited the court to consider evidence of what she told others, and benefitted from the resulting ruling that her witnesses could be asked whether she had told them she had been forcibly raped by respondent in 2009. She did not claim her delay was the result of trauma or fear of respondent or the disbelief of others, only that she wanted to preserve a good relationship between respondent and their daughter, which she felt would be impaired if she disclosed the rape to authorities or others. Respondent's different view was that appellant sought a DVRO and unjustifiably claimed she had been raped only after he married, had another child, excluded her from his and his wife's home, and became decidedly less deferential to her after belatedly realizing she could not take their child from him by moving away. The court found this view of the case more credible than that of appellant.

The trial court's statement that it "did not see evidence that was consistent with what I would expect following a forcible rape" was a reference to all the evidence in the case, not just appellant's failure to report the

---

discounted in a bench trial as in a jury trial. (See, e.g., Epstein & Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences* (2019) 167 U. Penn. L.Rev. 399, 399–400; accord, Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount* (2017) 166 U. Penn. L.Rev. 1.) We cannot assess the preva1ence of the institutional skepticism these commentators decry, but, as we will explain, we are convinced it did not come into play in this case.

alleged rape earlier. As we have said, the court's conclusion is amply supported by evidence that appellant advanced the rape claim only after she lost her previous hold on respondent; that she was not reluctant to complain to others about respondent and described incidents that allegedly caused her to fear him, but did not tell any of the many friends who testified on her behalf that he forcibly raped her; and that she invited respondent to live in her building, and later her apartment, for a considerable period of time, periodically had sexual relations with him, and accompanied him on numerous family and camping trips, including one on which she knew he brought a gun, which she now says "terrified" her, and even arranged an opportunity for him to use it. Thus, as in *Schmidt v. Superior Court, supra,* 44 Cal.App.5th at page 591, "[u]nlike the trial courts in *Catchpole* and *Iverson*, this trial court evaluated witnesses on proper and conventional grounds. Credibility determinations were unavoidable in this trial. Witness conflicts made it essential for the court to decide which side had better historians."

Appellant's analogy between the statements of the trial judge here and the judicial comments about women in *Catchpole* and *Iverson* is baseless, as is her claim of actual bias. As we have explained, " ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable," ' " must be "based on an objective assessment of the circumstances in the particular case." (*Freeman, supra,* 47 Cal.4th at p. 996.) An objective assessment of Judge Darwin's conduct reveals it to be exemplary in every respect.

## DISPOSITION

For the foregoing reasons, the challenged rulings are affirmed. Respondent is awarded his costs on appeal.

                                        _____

                                          Kline, P.J.

We concur:

_____

Stewart, J.


_____

Miller, J.

*Jennifer K. v. Shane K.* (A155111)

41

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Richard C. Darwin |
| Attorneys for Appellant: | Perry, Johnson, Anderson, Miller & Moskowitz<br>Deborah S. Bull |
| Attorneys for Amicus Curiae<br>On behalf of Appellant: | Sheppard, Mullin, Richter & Hampton<br>Robert T. Sturgeon<br>Domestic Violence Legal Empowerment<br>and Appeals Project<br>Family Violence Appellate Project<br><br>Arnold & Porter Kaye Scholer<br>Trenton H. Norris<br>Amy Endicott<br>Shannon Morrissey<br><br>Legal Momentum<br>Jennifer M. Becker, *pro hac vice*<br>Lynn Hecht Schafran, *pro hac vice* |
| Attorneys for Respondent: | Shane K., in pro. per.; Lvovich & Szucsko<br>Terry A. Szucsko<br>Hannah R. Salass |